UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
KEESHA MITCHELL *et al.*,                                    :
                                                             :
                        Plaintiffs,         :    **MEMORANDUM**
                                                             :    **DECISION AND ORDER**
         -against-                                    :
                                                             :    09 Civ. 1587 (BMC)
                                                             :
                                                             :
LYONS PROFESSIONAL SERVICES, INC., *et*      :
*al.*,                                                       :
                                                             :
                        Defendants.        :

------------------------------------------------------------ X
**COGAN**, District Judge.

      Before me is the motion of plaintiffs/judgment creditors for post-judgment relief under Fed. R. Civ. P. 69(a) and N.Y. C.P.L.R. 5225(b) based on an alleged fraudulent conveyance from the defendant/judgment debtor, Lyons Professional Services ("LPS"), to Garrison Protective Services, Inc. The factual issues on the motion were tried before me without a jury. I find that LPS transferred substantially all of its assets to Garrison despite plaintiffs' outstanding judgment and that LPS received no consideration for the transfer. I further find that the value of the asset transferred exceeded the amount of plaintiffs' judgment. Plaintiffs' motion is therefore granted.

## BACKGROUND

      Plaintiffs brought this action against LPS, which was a security guard company, and two of its supervisors for employment discrimination under federal, state and local law. Plaintiffs dismissed one of the supervisors and settled with the other after a default judgment was entered against him. LPS also defaulted, and I held an inquest on damages, after which I rendered judgment severally as to each of the four plaintiffs for a total amount of $266,590.

Seven weeks after entry of judgment, Garrison, which was another security guard company, and Mr. Lyons entered into a "Consulting Agreement." The Consulting Agreement provided as follows:

> WHEREAS, the Consultant [Mr. Lyons] was recently employed by LYONS PROFESSIONAL SERVICES, INC. and established a certain following of customers and accounts; and
>
> WHEREAS, Consultant, simultaneously upon execution of this Agreement, will terminate his employment with LYONS PROFESSIONAL SERVICES, INC. but shall continue to service these customers and accounts for the consulting fee set forth below …

Appended to and referenced in the Consulting Agreement was a spreadsheet entitled "Customer Data Schedule l.a 'Existing Purchase Price Accounts'." It was a list of then-current LPS clients (the "LPS accounts") which Mr. Lyons would attempt to steer to Garrison, along with the projected gross weekly revenue of each. These projections were then totaled, and reduced by the projected payroll costs attendant to each account. As a result of this computation, the Schedule anticipated net weekly revenues after payroll of just under $8000 per week. This amount was described on the schedule as "Gross Profit," likely because it was still subject to reduction for fixed or variable costs attendant to either LPS' or Garrison's business beyond the payroll expense generated by each account. In addition, the Schedule contained a column corresponding to each client entitled "Total Purchase." This was not explained to me, but based on the numbers, it appears that it was the total amount to which the client was indebted under its contract with LPS, although Michael Tenreiro, the President of Garrison, testified that typically, in the security guard industry, any client is free to terminate its contract on 30 days' notice.

According to Mr. Lyons' testimony, the LPS accounts reflected all of the clients that LPS had. Once Garrison took over these accounts from LPS, Mr. Lyons testified, LPS was essentially shut down. It had been losing money and accumulating debt for years prior to the

Consulting Agreement, which was why Mr. Lyons agreed to become a "consultant" for Garrison. Mr. Lyons testified that LPS had no other assets once the clients moved to Garrison other than a computer, a fax machine, a copy machine, and a 2000 Ford Taurus patrol car, which he used as his personal vehicle.

All of LPS' security guard employees were entered in Garrison's computer system; many re-applied to Garrison, and to a large extent, they continued in their prior assignments with the former LPS clients. After execution of the Consulting Agreement, LPS had no employees. (Mr. Lyons, however, testified that he remained the sole employee of LPS, notwithstanding the terms of the Consulting Agreement.)

In exchange for referring LPS' former clients, the Consulting Agreement provided that Mr. Lyons, but not LPS, would receive consideration of $180,000 per year for three years, subject to several contingencies. First, there was a target revenue amount for the LPS clients of $1,379,622 per year (the "revenue target"). Every six months, the parties would review the total amount collected on the LPS accounts for that period, and if the revenue collected was less than half of the revenue target for that year, Mr. Lyons' "consulting fee" would be reduced proportionately. Second, Mr. Lyons would earn 5% of any the gross receipts from any new client that he brought in to Garrison, but only if the LPS account collections hit or exceeded the revenue target.

The testimony at trial was not entirely clear as to how this arrangement worked in practice. The most I can find is the following. First, Mr. Tenreiro testified that although the LPS accounts started doing business with Garrison pursuant to Mr. Lyons' efforts under the Consulting Agreement, three or four of the LPS accounts left Garrison at different times within a period of three to eighteen months thereafter. Until they left Garrison, and continuing for the

3

clients who did not leave, the weekly revenue projection on the Schedule to the Consulting Agreement approximated what those clients actually paid.

Mr. Tenreiro also testified that Mr. Lyons did not hit the revenue target for the first year of the agreement, missing it by about 30%, and it went down for the remaining two years. He recall from memory how the LPS accounts performed under the second and third years of the agreement, and plaintiffs had apparently taken no discovery to obtain this information, but Mr. Tenreiro believed that over its term, Mr. Lyons was paid approximately $300,000. That amount included additional revenues based on new business that Mr. Lyons brought in, but Mr. Tenreiro was not asked and did not explain why Mr. Lyons was paid additional sums for new business since he did not hit the revenue target. Finally, Mr. Tenreiro explained that Garrison generates gross profit of about 30% and has a net profit margin of 2%-3%.

As to any services provided to Garrison by Mr. Lyons after execution of the Consulting Agreement, the record shows that Mr. Lyons made the introduction of the LPS clients to Garrison and either based on his recommendation of Garrison or the mere fact that he advised clients that he was shutting down LPS, or both, the clients agreed to move their business to Garrison. There were some telephone calls by Mr. Lyons to Garrison thereafter but the record contains no indication that he actually provided any services beyond his initial endorsement of Garrison to LPS' clients.

## DISCUSSION

Plaintiffs challenge Garrison's acquisition of the LPS accounts as constructively fraudulent under N.Y. Debtor-Creditor Law §273-a (McKinney 2013).[1] The statute provides that

> [e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.

Id. To prevail on a claim under NYDCL § 273-a, a plaintiff must establish that (1) the conveyance was made without fair consideration; (2) the conveyor was, at the time of the conveyance, "a defendant in an action for money damages" or "a judgment in such an action has been docketed against him"; and (3) the conveyor has "failed to satisfy the judgment." NYDCL § 273-a. See Grace v. Bank Leumi Trust Co., 443 F.3d 180, 188-89 (2d Cir. 2006); Taylor-Outten v. Taylor, 248 A.D.2d 934, 670 N.Y.S.2d 295, 296 (4th Dep't 1998). Plaintiffs' theory of the case is that LPS conveyed an asset after final judgment had been entered against it and received no consideration for it. The "asset" upon which this theory based is, as described by Mr. Lyons and Mr. Tenreiro in their testimony, LPS' "book of business," i.e., the customer service contracts that LPS held prior to the transfer.

---

[1] There are three notable points about plaintiffs' theory of the case as set forth their post-trial briefs. First, for reasons that are unexplained, plaintiffs are not proceeding on a theory that Mr. Lyons had an actual intent to defraud plaintiffs when he engaged in the transaction with Garrison, which would be actionable under N.Y. Debtor-Creditor Law § 276. Second, plaintiffs have not invoked N.Y. Debtor-Creditor Law §273, which permits avoidance of transfers by an insolvent transferor. Third, although plaintiffs purport to rely on N.Y. Debtor-Creditor Law §275, which renders avoidable any transaction in which the debtor intends to incur a debt, that statute has no application here. Section 275 is prospective, and addresses the situation where a debtor, in anticipation of incurring a debt or judgment, transfers assets. Here, LPS had already suffered a judgment when Mr. Lyons engaged in the transaction with Garrison, so there was no anticipatory transfer as contemplated by §275.

In response, Garrison contends that (a) there is no proof in the record that LPS was insolvent at the time of the transfer; (b) plaintiffs have failed to demonstrate any effort to execute upon the judgment; and (c) plaintiffs have failed to prove that the accounts transferred had any value.

Garrison's first two arguments can be readily rejected based upon the plain language of the statute and the cases applying it. As noted above (see fn. 1, supra), plaintiffs are not proceeding under §273, which requires a showing of insolvency. They are proceeding under §273-a. There is nothing in the language of §273-a that requires insolvency of the transferor nor any effort to execute on the judgment. Rather, it is incumbent on the debtor, which obviously knows it has a judgment against it, not to transfer assets for less than fair consideration until it has paid the judgment. In effect, §273-a substitutes the requirement of an unpaid judgment (or a pending action) for the requirement of insolvency in §273. As the court correctly noted in Republic Insurance Company v. Levy, 69 Misc.2d 450, 329 N.Y.S.2d 918 (1972):

> "Even if the gift was made without intent to defraud and if the judgment debtor was not rendered insolvent thereby and is not insolvent after judgment but simply chooses not to satisfy it, there is nevertheless no reason for requiring the judgment creditor to pursue him rather than a gratuitous recipient of the debtor's assets."
>
> From this, it is evident that the question of insolvency is irrelevant to the considerations at hand. …
>
> The statute only requires that defendant "fail to satisfy the judgment." A showing of defendants' failure to pay the judgment when entered is sufficient to entitle relief to plaintiff under section 273-a without having to resort to enforcement proceedings. This interpretation is reinforced by the language in the comments wherein they sanction relief under the section even if defendant "simply chooses not to satisfy it". It is also consistent with the committee's intent to 'discourage' a defendant from disposing of assets in contemplation of an adverse judgment.

Id. at 453, 329 N.Y.S.2d at 921 (quoting Advisory Committee on Practice and Procedure, Third Preliminary Report (N.Y. Legis. Doc. 1959 No. 17), p. 288)). Accord, Dixie Yarns, Inc. v.

6

Forman, 906 F. Supp. 929, 938 (S.D.N.Y. 1995) ("a claimant under § 273-a need not demonstrate the insolvency of the judgment debtor. It is sufficient to support the claim that the judgment has not been satisfied."); In re Panepinto, 487 B.R. 370, 372 (Bankr. W.D.N.Y. 2013).[2]

Garrison's somewhat more substantial argument is that plaintiffs have failed to offer proof of the value of the book of business that Garrison received.  To be sure, the theory of damages in plaintiffs' post-trial submission is insufficient.  Plaintiffs attempt to work off the Schedule to the Consulting Agreement.  They take the approximate $8000 per week net payment (after security guard salaries) from the date of the Consulting Agreement and project it out to the date they filed their post-trial brief, coming to a total of $1,381,118 (which is quite close to the revenue target).  Since this is in excess of the judgment, plaintiffs argue, they are entitled to judgment against Garrison in the full amount of the judgment.

There are deficiencies with plaintiffs' calculation.  Suffice it to say that we know, from Mr. Tenreiro's testimony, that the revenue target was not hit, and, indeed, several LPS clients left Garrison between three months and eighteen months after they came.  Thus, there is no basis for assuming, as plaintiffs' calculation does, that the revenue stream in the Schedule to the Consulting Agreement was fully realized.  We know it was not.  And plaintiffs have offered no evidence of the precise or even reasonably estimated revenue that Garrison in fact collected from the LPS accounts subsequent to the Consulting Agreement.

---

[2] Even if plaintiffs had to show insolvency, I would easily find that here.  Garrison points out that New York courts require a "balance sheet test" for insolvency under the Debtor-Creditor Law, citing In re Chin, 492 B.R. 117, 127 (Bankr. S.D.N.Y. 2013), and argues that plaintiffs have failed to submit evidence of the value of the assets that LPS transferred or retained, so insolvency cannot be shown. Balance sheet testing is a useful tool when the value of assets transferred or retained is in issue.  However, Mr. Lyons' testimony is clear that LPS had no more assets after the transfer, and obviously it was subject to plaintiffs' judgment.  Mr. Lyons also testified that the business was losing money, was "failing," in his words, and had unpaid tax obligations.  I wouldn't need a balance sheet to tell me that LPS was insolvent at the time Mr. Lyons and Garrison entered into the Consulting Agreement.

7

Garrison also argues that, in fact, the LPS accounts had no real value and thus LPS lost nothing through the Consulting Agreement.  It points out that plaintiffs offered no expert testimony as to value, that the LPS customer contracts were not assignable, and that their only value was based on Mr. Lyons' personal relationship with the clients and thus it was Mr. Lyons' personal connections, not the contracts, that had any value.

I reject Garrison's effort to exalt form over substance.  Garrison and Mr. Lyons can call this a Consulting Agreement if they want to (obviously they do), but it's clear that what really happened here was a sale of the only LPS asset that had any value.  Mr. Tenreiro's opinion expressed at trial that the LPS accounts were worth nothing to him, only Mr. Lyons could generate the income, is convenient but ignores the fact that the accounts still had to be serviced and that all Mr. Lyons had to do was steer them to Garrison.  Both Mr. Lyons and Mr. Tenreiro described this asset as a "book of business," but it was not Mr. Lyons' book of business – it was LPS'.  That is so even though Mr. Lyons had the personal connections to transfer the book.  He was an employee of LPS and he and Garrison could not disguise the consideration for LPS' book of business as a "consulting fee," thus insulating it from the reach of LPS' creditors.

If Mr. Lyons had wanted to shut down LPS and let its clients fend for themselves, he could do so – he had no obligation to keep working for LPS' creditors.  But if he wanted to realize value for that book of business, he could not keep it for himself.  Before the Consulting Agreement, LPS had a book of business that had sufficient value that Garrison wanted to buy it, and yet LPS received nothing for it.

A number of cases recognize the value inherent in the transfer of a debtor's book of business, even if it is the debtor's employees who control the business.  In In re S.W. Bach & Company, 435 B.R. 86 (Bankr. S.D.N.Y. 2010), for example, the debtor, a securities broker-

dealer, was having severe financial problems. It met with a potential purchaser, AGI, which was another broker-dealer. AGI stated that although it would not purchase the debtor's customer accounts – the debtor's prime asset – outright, it would take over the management of the accounts, and pay the debtor's president a fee for referring them (although, in the event, no such fee was paid). The debtor's president thereupon directed its clearing agent to transfer its customer accounts to the transferee broker-dealer. Concurrently with this instruction, the debtor went out of business, delisting itself with the Securities and Exchange Commission and the National Association of Securities Dealers, so that after a short wind-down period, it would no longer be able to legally manage its client accounts. The debtor's customers were then notified that their accounts would be managed by AGI unless the customers affirmatively opted out.

Even though the accounts had been controlled by various brokers who were employees of the debtor, each of whom of course had a personal relationship with the customer, the court found that the debtor had an interest in managing its book of business, and transferring that interest without consideration was constructively fraudulent: "S.W. Bach's brokers were free to join other firms, and their account relationships were free to follow them, but that does not alter the fact that the right to manage the accounts was transferred." Id. at 880. It further held that "[w]hether specific accounts followed their brokers to AGI, or were transferred to AGI and then shortly afterward were again transferred elsewhere, may affect the amount of compensable damages, but it does not affect issues of liability." Id.

The facts in International Fidelity Insurance Company v. Unlimited Sales & Marketing, Inc., No. 07-0324, 2008 WL 2589135 (Ariz. App. June 26, 2008), although presented in the context of an actual intent to defraud claim, are indistinguishable from the instant case. The business of the debtor, a collection company, was failing, and it then had a judgment entered

9

against it. Its primary remaining asset was a book of business containing the names of 800 clients. Its president shut the company down, and he and its employees went to work for another collection company, where he was paid between 11% and 20% of all commissions earned on the debtor's former book of business. The trial and appellate courts found that the book of business was an asset of the debtor, and awarded damages since the debtor had received no consideration for its transfer.[3]  See also In re Heller Ehrman LLP, No. 08-32514, 2013 WL 951706 (Bankr. N.D. Cal. March 11, 2013) (debtor law firm's "unfinished business," i.e., pending matters taken by former law firm members when they moved to new firms, constituted valuable asset of the debtor); In re F&C Services, Inc., 44 B.R. 863 (Bankr. S.D. Fla. 1984) (recognizing book of business as asset of insolvent debtor, despite debtor's president's claim that he had no choice but to transfer it because business was failing).

I therefore reject Garrison's contention that LPS' client accounts were some sort of personal property of Mr. Lyons and not LPS. Those accounts were an LPS asset and LPS received nothing for them.

The question remains, however, as to what the value of those accounts is, now that I have rejected plaintiffs' speculative theory. As Garrison points out, the valuation of a book of business is usually a question resolved by expert testimony, and none was offered here. Nevertheless, on the particular facts of this case, it seems readily apparent that the value of the LPS accounts exceeds the amount of plaintiffs' judgment.

By Mr. Tenreiro's testimony, Garrison paid Mr. Lyons approximately $300,000 in "consulting fees" (really commissions) over the three year term of the agreement. It is no

---

[3] Although Arizona has adopted the Uniform Fraudulent Transfer Act, as opposed to New York's adoption in the Debtor-Creditor Law of the Uniform Fraudulent Conveyance Act, there is no difference between them as to recognizing a book of business in a debtor company as a valuable asset of the debtor. The same is true with regard to the fraudulent transfer provision of the Bankruptcy Code, 11 U.S.C. § 548.

wonder. Although precise numbers were not presented to me, the inference is clear from Mr. Tenreiro's testimony that Garrison received between $2 million and $2.5 millon in revenue from servicing the LPS accounts during those three years. We can derive this because Mr. Tenreiro testified that Mr. Lyons missed his revenue target in the first year by about 30%, which would mean gross revenue of just under $1 million in that first year. We also know that had he hit the revenue target each year, Mr. Lyons would have been paid a total $540,000 ($180,000 per year for three years) on gross revenue of $4,138,866 from the LPS accounts.[4] The fact that he received 55% of his maximum amount under the Consulting Agreement ($300,000 of the $540,000) compels the conclusion that Garrison received about $2.3 million, which is 55% of its maximum anticipated gross revenues from the LPS accounts under the Consulting Agreement.

Of course, these are rough numbers, but they show that no matter how one values the LPS accounts, they were worth a lot more than the amount of the $266,590 judgment that plaintiffs had obtained against LPS. Even standing alone, the approximately $300,000 "consulting fee" paid to Mr. Lyons was in excess of the judgment, and obviously Garrison did not expect to break even on the LPS book of business once it paid Mr. Lyons his consulting fee. Considering that some number of the former LPS clients are still being served by Garrison today, it seems clear that no one could reasonably value the LPS accounts for less than the amount of the judgment, and indeed, less than the approximately $300,000 that Mr. Lyons received.

I see no need for experts to engage in a valuation exercise when Garrison and Mr. Lyons, in an arms-length transaction, indicated a mutually perceived value for the LPS accounts that exceeds plaintiffs' claim. In addition, there is a basic equity in resolving the case in this manner, because, as noted above, although plaintiffs have not asserted an actual intent to defraud claim,

---

[4] I am not crediting Mr. Tenreiro's testimony that Mr. Lyons received some unspecified amount from bringing in new business. Since he did not hit the revenue target, the Consulting Agreement did not allow it.

Mr. Lyons was not entitled to be paid anything for LPS' book of business while plaintiffs were left with an worthless shell.[5]

I therefore conclude that plaintiffs have proven their claim of fraudulent transfer under N.Y. Debtor-Creditor Law §273-a, and that the value of the LPS accounts, while not ascertainable with precision on this record, was in excess of the amount of plaintiffs' judgment.

## CONCLUSION

Plaintiffs' motion for relief under N.Y. C.P.L.R. 5225 is granted. The Clerk is directed to enter judgment in favor of plaintiffs and against Christopher Lyons and Garrison Protective Services, Inc., jointly and severally, in the amount of $266,590.

**SO ORDERED.**

U.S.D.J.

Dated: Brooklyn, New York
September 1, 2013

---

[5] Garrison has not argued that its receipt of the fraudulent conveyance should be excused because it acted in good faith, although some of Mr. Tenreiro's testimony at trial was evocative of this defense. It does not matter. Good faith is an issue only when the transferee has paid fair consideration to the debtor, and, here, Garrison paid no consideration to the debtor. In other words, lack of good faith will render a conveyance for fair consideration voidable, but the presence of good faith will not save a conveyance that lacks fair consideration. See In re Trace Intern. Holdings, Inc., 287 B.R. 98, 107 (Bankr. S.D.N.Y. 2002).