UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
KEESHA MITCHELL, THERESA                                      :
CAMPBELL, SEANETTE CAMPBELL and                              :
TANISHA SELBY,                                                :        **MEMORANDUM**
                                                              :        **DECISION AND ORDER**
                                    Plaintiffs,               :
                                                              :         09 Civ. 1587 (BMC)
                     - against -                              :
                                                              :
LYONS PROFESSIONAL SERVICES, INC.,                           :
RICHARD TRIM AND TERRY TATUM,                                :
                                                              :
                                    Defendants.               :
                                                              :
------------------------------------------------------------- X

**COGAN**, District Judge.

The issue posed in this case is whether the customer accounts of an insolvent service

company, where each customer had the right to terminate service at any time, can nevertheless

have value, such that if the principal of the business moves those customers to a third party in

exchange for money, and the company receives nothing (leaving creditors of the company

without recourse), the transaction is avoidable as a fraudulent conveyance under New York's

enactment of the Uniform Fraudulent Conveyance Act. I answer that question in the affirmative.

**BACKGROUND**

This fraudulent transfer case is before me on remand from the United States Court of

Appeals for the Second Circuit, pursuant to its Mandate issued on October 2, 2014. See Mitchell

v. Lyons, 579 F. App'x 18 (2d Cir. 2014) ("Mitchell II"), vacating, No. 09-cv-1587, 2013 WL

4710431 (E.D.N.Y. Sept. 1, 2013) ("Mitchell I"). Familiarity with the Second Circuit's decision

and my prior decision is assumed, but to summarize, plaintiffs are judgment creditors of a now-

defunct security guard company called Lyons Professional Services, Inc. ("LPS") in the total

amount of $266,590. The owner and manager of LPS was defendant Christopher Lyons.

Plaintiffs, former employees of LPS, obtained their judgment on default after demonstrating that they had been the victims of egregious sexual harassment and sexual assault by other LPS employees.

Shortly after the entry of judgment, Christopher Lyons entered into a "consulting agreement" with Garrison Protective Services, Inc. ("Garrison"), the garnishee in this action. Lyons was paid $300,000 to move LPS' customer accounts to Garrison. Lyons made the following representation in the consulting agreement:

> Consultant represents and warrants that the customers set forth in Exhibit "A" annexed hereto were the customers of LYONS PROFESSIONAL SERVICES, INC. that Consultant had procured for LYONS PROFESSIONAL SERVICES, INC. through his own efforts and that the hours, prices, terms and figures related to those customers set forth in Exhibit "A" are true and accurate as of the date hereof. Consultant represents that he has previously entered into an agreement with LYONS PROFESSIONAL SERVICES, INC. whereby the Consultant is free to compete with LYONS PROFESSIONAL SERVICES, INC. and to solicit customers of LYONS PROFESSIONAL SERVICES, INC. previously procured by the Employee [sic] without restriction or impediment.

> Consultant further represents and acknowledges that as consideration for entering into this Agreement, Garrison shall be the owner of the accounts reflected on Exhibit "A".

The agreement also provided that Lyons would "resign" as an employee of LPS but would continue to serve its former customers. After a trial, I found as a factual matter that Garrison cared little or nothing about Lyons' future labors on its behalf; the parties intended the agreement to capture the customer accounts of LPS and the business opportunity that they presented. I also found that all or almost all of the clients previously served by LPS moved over to Garrison, although there was some attrition shortly thereafter and more attrition over time.

Because LPS had received no value for providing its customer list to Garrison, I found that LPS and, derivatively, plaintiffs as creditors, had received no consideration for what I

described as the "book of business" of LPS. "Book of business" was the term that Garrison's principal, Michael Tenreiro, had used when he testified at trial to describe what Garrison had acquired. Based on these factual findings, I held that the transaction was fraudulent under New York Debtor and Creditor Law ("DCL") § 273-a. Because the amount owed on the judgment to plaintiffs was less than the amount Lyons had received under the "consulting agreement," I directed entry of judgment against Garrison and Lyons for the amount that LPS owed plaintiffs.

The Second Circuit vacated my decision with instructions to consider issues related to whether LPS' "book of business" was composed of assignable or transferrable property, which it noted "depend[s] at least in part" on the nature of the contractual arrangements between LPS and its clients. The Circuit held that "the record is insufficient to conclude that the 'book of business' was property for purposes of [New York C.P.L.R.] § 5201." It noted that none of the LPS contracts were introduced at trial, and it found ambiguous my holding that "LPS *transferred* substantially all of its assets *to Garrison . . .*" when juxtaposed against my finding that "*Mr. Lyons made the introduction of the LPS clients to Garrison …* [and] *the clients agreed to move their business to Garrison*." Mitchell II, 579 F. App'x at 23 (emphasis in original).

## DISCUSSION

On remand, the parties have made additional submissions to help me consider the issue identified by the Second Circuit. Garrison has submitted the affidavit of Mr. Tenreiro. It makes the following points, among others:

- Although he testified at trial that the industry commonly has one-year contracts with 30-day termination clauses, in this case, LPS had no written contracts at all, leaving clients free to change providers at any time.

- When he referred to a "book of business" in his trial testimony, he meant that it was Christopher Lyons' book of business, not that of LPS.

- At the time of his deal with Mr. Lyons, "LPS was unable to continue to service its customers due to its financial hardships. As such, these customers could no longer do

business with LPS."

Plaintiffs point out that Mr. Tenreiro's affidavit is inconsistent with his deposition testimony, in which he disclaimed knowledge of LPS or its arrangements with its customers. Plaintiffs have submitted Tenreiro's deposition testimony, and they are correct; I do not know where Mr. Tenreiro acquired his new knowledge of the structure of LPS' business, but his recent affidavit is flatly inconsistent with his deposition testimony, in which he knew none of the things about LPS that he now professes to know. His affidavit is thus either based on newly acquired hearsay from Mr. Lyons (or some unknown source), or he dissembled at his deposition. I will not allow Mr. Tenreiro to contradict his deposition testimony in that way. Cf. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ( "factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts [his] own deposition testimony"). However, it bears noting that Mr. Tenreiro now acknowledges that at the time of the transaction, he was aware that LPS was in financial distress.

Recognizing the inconsistency in Mr. Tenreiro's testimonies does not help me with the open issue identified by the Second Circuit. Plaintiffs had the opportunity for discovery, yet have not introduced any written contracts; nor have they suggested that Lyons, LPS or Garrison failed to produce such contracts (if they even asked for them). It is plaintiffs' burden to prove the fraudulent conveyance, and in the absence of any definitive proof, I am compelled to accept Mr. Tenreiro's averment that there were no written contracts. That leaves us with contracts terminable at will, not even requiring the 30-days' notice which, based on Mr. Tenreiro's trial testimony about industry practice, I wrongly found to be the case with the LPS contracts.

I read the Second Circuit's decision as holding that if the contracts are terminable at will, their value is too speculative to have them qualify as "property" under C.P.L.R. § 5201. See Mitchell II, 579 F. App'x at 22 (citing Verizon New England, Inc. v. Transcom Enhanced Servs., Inc., 21 N.Y.3d 66, 71 (2013)). I therefore would be required to deny plaintiffs' motion to the extent it contends that by acquiring any contractual rights from LPS, Garrison is a fraudulent transferee.

That, however, was never really the question for me. As the Second Circuit also recognized, "[a] company's book of business can include . . . customer lists, leads for potential business, and other proprietary information." Id. The Circuit regarded this issue as another open question in this case: "Questions also exist as to whether the book of business contained other property, such as customer lists or other proprietary information, and, if so, whether such property was transferable." Id. at 23.

The issue of whether a customer contact list, sometimes referred to as a customer list, a contact list, or even customer accounts (as sometimes distinguished from accounts receivable), can be the subject of a fraudulent transfer is sometimes factually complex. Despite the fact that the issue can arise under three different statutes and revised versions of those statutes which do not appear to differ on this issue – the Uniform Fraudulent Conveyance Act of 1918 (in effect in New York and 2 other states, plus the Virgin Islands); the Uniform Fraudulent Transfer Act of 1984 (in effect in 45 states); and the fraudulent transfer provision of the U.S. Bankruptcy Code, 11 U.S.C. § 548 – few cases discuss the issue in any detail.

Most cases are in accord with the Circuit's observation, recognizing that a client list is a form of goodwill and goodwill can be fraudulently conveyed like any other interest in property. See, e.g., Jones v. Tauber & Balser, P.C., 503 B.R. 162, 181-83 (Bankr. N.D. Ga. 2013) (finding

that "book of business" consisting of client list could be the subject of a fraudulent transfer action and collecting cases under the UFTA).[1]  In <u>Friedman v. Wahrsager</u>, 848 F. Supp. 2d 278, 286, 292 (E.D.N.Y. 2012), Judge Hurley denied a motion to dismiss a fraudulent conveyance claim based on allegations that the owners and officers of a closely held company had, among other things, "cancel[ed]customer accounts and mov[ed] them" to a new corporation they had formed, "or otherwise encourag[ed] customers to switch" their business to the new company. <u>Cf.</u> <u>In re Accurate Home Inspectors, Inc.</u>, 348 B.R. 354 (Bankr. E.D. La. 2005) (where consulting agreement provided that debtor's principal would receive fee for providing consulting services to defendant and for purchase of debtor's contact list, but in fact debtor had done no business so there was no contact list, transaction was not a fraudulent transfer).

The closest case factually to the instant case, and perhaps the most carefully reasoned, is <u>Glosband v. Watts Detective Agency, Inc.</u>, 21 B.R. 963 (D. Mass. 1981), which also involved the security guard industry.  There, the debtor was insolvent.  All of its customers were without contracts of any term.  Its President attempted to negotiate a sale of the company to a competitor, but was unsuccessful; he then announced that he was "walking away" from the business. However, the debtor's Vice President, who had relationships with the customers, accepted an offer of employment with the competitor, and proceeded to use the customer list to move the customers over to the competitor.  After a jury returned a judgment against the Vice President and the competitor for, *inter alia*, fraudulently conveying the customer list, the district court denied the defendants' motion for a new trial.  It held that "[i]n some cases, customer lists, even

---

[1] The Second Circuit directed my consideration of <u>In re Thelen LLP</u>, 24 N.Y.3d 16, 995 N.Y.S.2d 534 (2014), but I think the special considerations attendant to the attorney-client relationship and the policy encouraging clients to have the ability to select their lawyers make that case inapposite in the context of commercial transactions like the one at issue here.

if not confidential, may be protectable property under the customer list cases if they are reduced to writing . . . ." Id. at 973. The court further held:

> The jury could have found that while it would be relatively easy for competitors to observe a particular business and to ascertain whether it was among the bankrupt's customers, some significant difficulty would have arisen in duplicating the bankrupt's entire customer list, as that would have involved surveying all businesses in the area which would potentially be in need of security guards and ascertaining whether or not their needs were being serviced by the bankrupt. . . . Furthermore, there was testimony that many customers had had continued good relations with the bankrupt, a factor that would enhance the value of the list. Under both the somewhat restricted customer list cases and the broader compass of the definition of "property" fashioned earlier in this opinion, the jury could reasonably have found the Sullivan Company lists transferred to defendant Watts to have been property.

Id. at 974. My initial decision in this matter was driven by the fact that Garrison and Lyons had expressly placed a value on the customer list – they had simply arranged for that value to go to Lyons instead of LPS. The fact that most or all of the customers moved (at least initially) to Garrison confirmed the parties' expectation that the list had value.

The Court reached the same conclusion regarding contact lists on similar facts in Nader v. Citron, 372 Mass. 96, 360 N.E.2d 870 (1977), abrogated on other grounds, Iannacchino v. Ford Motor Co., 451 Mass. 623, 888 N.E.2d 879 (2008). There, Ralph Nader entered into a contract with a booking company called Phillip Citron, Inc. ("PCI"), which was wholly owned by its namesake, to arrange paid speaking engagements for him. The contract called for PCI to book engagements for Mr. Nader, collect the fee, deduct its commission, and remit the balance to Mr. Nader, but it became insolvent after a time and failed to remit anything to Mr. Nader, leaving him with an uncollectable receivable. While this was happening, another booking agency, Lordly, was considering merging with PCI, but it decided not to once Mr. Nader received a judgment against PCI. Instead, it hired Phillip Citron as an employee and had him bring client and customer lists which "constituted all of the assets of P.C.I., which Lordly

obtained without assuming the liabilities of P.C.I." Id. at 99. The Supreme Judicial Court of Massachusetts held that Mr. Nader's complaint, setting forth these facts, adequately stated a claim under the Uniform Fraudulent Conveyance Act: "These allegations, if proved, would constitute a conveyance without fair consideration rendering P.C.I. insolvent under § 4 [constructive fraud], or a conveyance made with actual intent to hinder, delay, or defraud creditors under § 7 [actual fraud]." Id. at 105.

Although it thus seems clear that customer lists can have value under the UFCA, there is yet another issue that arises because of the peculiar manner of enforcing these rights in New York courts generally and in a New York federal district court in particular.

The Second Circuit in its decision in this case assumed without discussion that the issue it decided turns on whether such property "could be assigned or transferred," the qualifying phrase in C.P.L.R. § 5201. This was a logical assumption since, after all, plaintiffs' motion was brought under C.P.L.R. § 5225, part of the "Enforcement of Judgments" provision of that statute. However, in my decision, I had approached the inquiry from a different, broader, perspective. That perspective was not explained clearly enough, which may explain why the Circuit remanded for further consideration, but I remain of the view that my perspective was correct.

The governing substantive provision for avoiding a fraudulent conveyance under New York law is its version of the UFCA, Article 10 of the Debtor and Creditor Law § 270 *et seq*. Under New York law, unlike perhaps any other jurisdiction, there are two different procedural vehicles for seeking to avoid a fraudulent conveyance. The first is the familiar plenary action, used in New York and all other common law jurisdictions, and the method by which fraudulent transfer claims have been prosecuted since the Statute of 13 Elizabeth, 13 Elz. 1, ch. 5 (1571), first made them actionable. See generally Granfinanciera. S.A. v. Nordberg, 492 U.S. 33, 43,109

S.Ct. 2782, 2791 (1989) ("There is no dispute that actions to recover preferential or fraudulent transfers were often brought at law in late 18th-century England."). Such a lawsuit proceeds in the ordinary course – summons and complaint, answer or motion to dismiss, discovery, and summary judgment or trial.

Under the modernized versions of state and federal fraudulent transfer law cited above, the plaintiff in such a plenary action may be, but is not required to be, a judgment creditor. Even a contingent creditor or a creditor whose claim has not matured or been liquidated to judgment may sue for actual or constructive fraud if the requirements of the statute (*e.g.*, actual intent to defraud, or various forms of constructive fraud) are met. See, e.g., N.Y. Debt. & Cred. Law § 270 ("'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.").

The important point to be taken away is that when the plaintiff in such an action is not a judgment creditor, neither C.P.L.R. § 5201 nor anything in Article 52 of the C.P.L.R. have anything to do with whether she prevails. Such a plenary action is not enforcing a judgment. It is a suit to *obtain* a judgment based on the fraudulent conduct of a debtor. It is the case, of course, that in a practical sense, this plenary action may obviate the need to utilize the enforcement mechanisms of Article 52 by yielding a money judgment or equitable relief against a third party, the fraudulent transferee, in favor of the plaintiff. The third party may satisfy this judgment without the creditor needing to resort to Article 52, or if he doesn't, the mechanisms in Article 52 may then be invoked against that new judgment debtor. But until relief is obtained against the transferee, Article 52 of the C.P.L.R. plays no role in defining whether the conveyance was fraudulent.

What C.P.L.R. §§ 5225 and 5227 provide, in contrast to a plenary action, is a procedural mechanism for attacking a fraudulent conveyance by a judgment debtor, colloquially known as "turnover proceedings." These statutory provisions are species of the peculiar New York procedure known as "special proceedings." As many cases have observed, see e.g., Cruz v. T.D. Bank, N.A., No. 10 Civ. 8026, 2014 WL 1569491, at *3-4 (S.D.N.Y. Apr. 17, 2014), reconsideration granted in part on other grounds, 2014 WL 2506292 (S.D.N.Y. June 3, 2014), special proceedings substitute, in effect, a motion in lieu of a plenary action, based on the sometimes overly optimistic view that certain kinds of relief are amenable to summary disposition. The action is commenced by a notice of petition and supporting affidavits and other documentary proof, and the opposition will likewise contain evidence. Discovery is not generally permitted and the matter is determined on the written record, without live testimony, consistent with the goal of expedited disposition – "[s]peed, economy and efficiency are the hallmarks of this procedure." JW Oilfield Equip., LLC v. Commerzbank, AG, 764 F. Supp. 2d 587, 591 (S.D.N.Y. 2011).

In at least one important respect, this mechanism is broader than a plenary action under the Debtor and Creditor Law: It allows recovery from a third party garnishee even when there has been no fraudulent conveyance. The mere fact that the garnishee owes money to or holds the property of the judgment debtor is sufficient grounds for a judgment in a turnover proceeding against the garnishee. Indeed, in my experience, this is a more frequent use of C.P.L.R. §§ 5225 or 5227 than as a vehicle for attacking a fraudulent conveyance.[2]

---

[2] In the typical execution scenario, the judgment creditor will serve a C.P.L.R. § 5222 restraining notice on a known or suspected garnishee to freeze the asset or the account debt (often a bank); the Sheriff will then serve an execution on the garnishee; and if the garnishee does not remit the judgment debtor's property to the Sheriff, the judgment creditor will bring a turnover proceeding so that the Court will order it. The preliminary steps are not required, but a cautious judgment creditor will utilize them, both to prevent the judgment debtor from transferring the asset *pendent lite* and to prevent other creditors from obtaining superior liens before a turnover order can be procured.

However, in other respects, a turnover proceeding is narrower than a plenary action under the fraudulent conveyance law. For one thing, the proceeding can only be brought by a judgment creditor, not a creditor with a claim, no matter how meritorious, that has not been reduced to judgment. Article 52 is an execution chapter and one must be a judgment creditor to use it. More importantly for our purposes, § 5201 defines the property that can be the subject of a turnover proceeding as "any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment."

The basis of a cause of action under the DCL is subtlely broader, or at least different in a way that can be broader, than C.P.L.R. § 5201. Unlike C.P.L.R. § 5201, the scope of Article 10 of the DCL is not defined by the nature of the property interest under attack. Rather, it focuses on the *conduct* of the debtor. It therefore applies to "conveyances" by the debtor. "Conveyance" is defined in the statute, N.Y. Debt. & Cred. Law § 270, as including an assignment or transfer, but those are mere examples. The full definition states that "'Conveyance' includes every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance."

I read this, as have some of the few cases construing it, as an attempt to create as broad a net as possible for the purpose of avoiding transactions intended to frustrate creditors. Any movement of an interest by the debtor, where that interest has value to the debtor, that puts that interest beyond the reach of his creditors, falls within the statute. See, e.g., Del Mastr v. Grimado, No. L-2746-10, 2013 WL 4746486 (N. J. App. Div. Sept. 5, 2013) (unpublished) ("Where a company's business is to provide services, information about customers is a property right of the company") (quoting AYR Composition, Inc. v. Rosenberg, 261 N.J. Super. 495, 504,

619 A.2d 592, 597 (App. Div. 1993)); <u>SCD Chem. Distribs., Inc. v. Medley</u>, 203 Mich. App. 374, 379, 512 N.W.2d 86, 89 (1994) (holding that under UFTA, any interest of the debtor that has value falls within the term "conveyance"). That includes an assignment or transfer, but assignability or transferability, in my view, are not the *sine qua non* of avoidability under the UFCA or UFTA, even if they are under C.P.L.R. § 5201.

This distinction makes sense when one considers the different purposes of Article 52 of the C.P.L.R. and Article 10 of the DCL. The former is a procedural statute that can be invoked only by a judgment creditor. Its devices operate, almost entirely, as remedies *in rem* against a non-speculative interest of the debtor. The non-speculativeness of the debtor's interest is important because, as noted above, the devices in Article 52 most commonly reach parties who are not alleged to be fraudulent transferees, but who may owe unmatured or contingent debts to the judgment debtor. <u>See</u> <u>U.S. ex rel. Solera Const., Inc. v. J.A. Jones Const. Grp., LLC</u>, No. 03-cv-1383, 2010 WL 1269938, at *5 (E.D.N.Y. Apr. 2, 2010). Although Article 52 can reach intangibles, those intangibles must be sufficiently choate so that "innocent" parties, *i.e.*, non-fraudulent transferees, do not become obligated to turn over money or property that, depending on future events, they may never have had to turn over or pay to the judgment debtor. Indeed, the two cases that the Second Circuit cited for the proposition that property must be assignable or transferable to fall within Article 52 were not fraudulent conveyance cases; they were "mere garnishee" cases. <u>See</u> <u>ABKCO Indus., Inc. v. Apple Films, Inc.</u>, 39 N.Y.2d 670, 674, 385 N.Y.S.2d 511 (1976); <u>Sidwell & Co. v. Kamchatimpex</u>, 166 Misc.2d 639, 632 N.Y.S.2d 455, 459 (N.Y. Sup. Ct. 1995).[3]

---

[3] The cases are actually prejudgment attachment cases under of Article 62 of the C.P.L.R., but that Article incorporates C.P.L.R. § 5201 by reference. <u>See</u> C.P.L.R. §6202 ("Any debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment.").

The UFTA and UFCA serve a different purpose. They are conduct-regulating statutes. They create a tort for engaging in certain conduct that, prior to the year 1571, the common law did not plainly prohibit. Their purpose is to discourage debtors and their potential transferees from taking certain actions and to undo the damage caused by those actions if they do. If the debtor (judgment debtor or not) moves an interest in property with any economic value out of the reach of a creditor, that movement can be unwound or a money judgment can be entered against the transferee.[4] If the actual or constructive fraudulent intent of the debtor is demonstrated, the germane question is not how to characterize the interest conveyed, but, rather, whether the creditor now has a more difficult time collecting his debt as a result of the conveyance.

That is why the fraudulent transfer laws bring within them not only transfers of property, but any transaction done with the intent to "hinder" or "delay" creditors. N.Y. Debt. & Cred. Law § 276. If the value of a property interest held by the debtor that the creditor could have realized is diminished or even made more difficult to reach by reason of the debtor's conduct, then the conveyance falls within the statute. Thus, when I used the word "transfer" in my initial decision in this case, I was using it in the broader DCL sense rather than the more restrictive C.P.L.R. § 5201 sense – that is, to indicate a movement of value by a debtor intent upon depriving its creditors of that value.

To the extent that Article 52 of the C.P.L.R., the purpose of which is to establish various procedures for executing on judgments – *e.g.*, levy; restraining notice; turnover proceeding – permits execution on a narrower set of conveyances than Article 10 of the DCL by focusing on the *res* rather than the debtor's conduct, it cannot limit the rights of a judgment creditor who

---

[4] The latter remedy is appropriate where, as here, the transaction cannot be set aside. <u>See</u> <u>Neshewat v. Salem</u>, 365 F. Supp. 2d 508, 522 (S.D.N.Y. 2005), <u>aff'd</u>, 194 F. App'x 24 (2d Cir. 2006) (transferee no longer in possession of tangible assets); <u>see also</u>, <u>e.g.</u>, <u>United States v. Coppola</u>, No. 88-cv-3456, 1994 WL 665751 (E.D.N.Y. Nov. 7, 1994) (entering money judgment against the transferee where assets included goodwill and going-concern value).

chooses to proceed with a plenary action under Article 10. If Article 52 of the C.P.L.R. did that, it would create the anomaly that a contingent creditor, or one with an unmatured or unliquidated claim (who cannot proceed under Article 52 in any event) could attack a broader category of transactions than a creditor who has obtained a judgment. That result would be absurd.

Thus, under New York law, a judgment creditor has a choice. If he believes that an illegal conveyance of value is within the narrower property definition of C.P.L.R. § 5201, he may opt to use the expedited and less expensive avenue of a turnover proceeding. If he believes that it is the conduct of the debtor rather than the nature of the property interest that has made collection on the judgment more difficult (or that discovery is required, or that the facts are too complex for a special proceeding), he may bring a plenary action under the DCL as long as the interest that has been moved has value (and even if it is not transferable or assignable).

If that is the choice, then we must move on to the question of why that matters in the instant case. Plaintiffs proceeded, after all, by a motion under Fed. R. Civ. P. 69(a), specifically invoking C.P.L.R. § 5225, rather than commencing a plenary action. If Article 52 of the C.P.L.R. is not broad enough to recapture good will and customer lists where there are no contracts with or commitments from customers, then it could be argued that plaintiffs have themselves elected a procedure that precludes recovery.

The answer to this point is that there is no such thing as a special proceeding in federal practice, so a judgment creditor proceeding under Fed. R. Civ. P. 69 cannot be faulted for citing to C.P.L.R. § 5225. "A special proceeding is a creature of New York law with no federal analogue." <u>S.E.C. v. Colonial Inv. Mgmt. LLC</u>, No. 07 Civ. 8849, 2010 WL 4159276, at *3-4 (S.D.N.Y. Oct. 6, 2010). The Federal Rules of Civil Procedure do not recognize a special proceeding in lieu of an action. When a creditor brings a "motion" pursuant to C.P.L.R. § 5225,

the district court has to fit it within the Federal Rules the best way that it can, if it all, because the C.P.L.R. does not allow a "motion" unless made within an action. This need to mesh federal procedure with the unrecognized state vehicle of a special proceeding is not peculiar to turnover proceedings; federal district courts in New York have long been called upon to accept, reject, or adapt this aspect of New York state practice – all kinds of different special proceedings – in a variety of contexts. Compare Milgrim v. Orthopedic Associates Defined Contribution Pension Plan, 66 F.3d 68, 77 (2d Cir. 2011) ("But C.P.L.R. 5239 and 5240 [which provide for special proceedings to determine adverse claims and modifications of execution procedures, respectively] are state procedural rules; they provide no substantive rights and therefore have no relevance to this proceeding in federal court"), with Cruz v. TD Bank, N.A., 742 F.3d 520, 522–23 (2d Cir. 2013) (permitting proceeding under C.P.L.R. §§ 5239 and 5240); see also Retained Realty, Inc. v. Lieto, No. 08 Civ. 7975, 2009 WL 497351, at *1 (S.D.N.Y. Feb. 26, 2009) (nontenant removal proceeding); Casale v. Metro. Transp. Auth., No. 05 Civ. 4232, 2005 WL 3466405 (S.D.N.Y. Dec. 19, 2005) (Article 78 challenge to administrative action).

In a prior decision in the instant case, I held that Fed. R. Civ. P. 69(a), under which this garnishee action was initiated, did not require plaintiffs to file a plenary action. Mitchell v. Lyons, 727 F. Supp. 2d 120 (E.D.N.Y. 2010) (Rule 69 "does not require strict adherence to state procedural law, and that the judgment creditor may seek the relief provided under state law through a motion made in the original federal action"). But there is no doubt that plaintiffs could have proceeded by plenary action instead; that I had the discretion to order them to do so if I thought there was any purpose in it; and that they would have proceeded in that fashion had I so ordered them. There would be no jurisdictional impediment to a plenary action in this court, for the Second Circuit has squarely held that federal district courts, having entered the original

judgment, have supplemental subject matter jurisdiction to hear such actions. See Epperson v. Entm't Express, Inc., 242 F.3d 100 (2d Cir. 2001). And, indeed, the way the "motion" proceeded before me was much more akin to a plenary action than a special proceeding, here necessitating discovery, a trial, and a judgment under Fed. R. Civ. P. 58, not the mere granting of a motion.

Under Fed. R. Civ. P. 1, courts must apply the Rules to secure, among other things, a "just" determination of every action. Construing plaintiffs' "motion" for a turnover, something not recognized in federal practice but nevertheless necessarily cognizable in some form, as a special proceeding instead of a plenary action, to the extent that a special proceeding would preclude recovery where a plenary action would not, in my view, is not just. This is clear from looking at the economic realities of what happened here.

On Day 1, LPS was servicing a substantial number of customers. Those customers obviously needed the security services, and there is no reason discernable in the record to believe that any termination of those services by the customers was in the offing. On Day 2, Lyons took a vested right to $300,000, among other things, from Garrison, and walked away from the business. The only thing that Garrison received was the opportunity – call it a customer contact list, customer accounts, or business opportunity – to continue servicing those same customers. This was an opportunity that, before Day 2, belonged to LPS. The transition literally happened overnight. On April 2, 2010, Mr. Tenreiro sent the following note to the customers of LPS:

> Effective Thursday, April 1, at 12:01 a.m., Garrison Protective Services is now servicing all of your security needs. The Lyons team and GARRISON team have worked diligently to ensure a smooth transition and will place the utmost priority on not only continuing, but also enhancing the services for our new clients. The LYONS management team will remain in place and receive the guidance and support needed from the corporate office. . . . I ask that you forward all payments for services rendered on and after April 1, 2010 to: GARRISON PROTECTIVE SERVICES, INC.

The record discloses that the next day, the LPS clients continued to be serviced in at least substantial part by the same security guards as they had the day before. The record shows that those employees, in large part, carried over from LPS to Garrison, and stayed at the same sites on Day 2 they had serviced while working for LPS on Day 1.

Indeed, according to this memorandum, the customers were only told about this change after the fact, and there was not even a hint that they had a choice about it, although of course they did. The only difference economically was that the expectation of a continuing income stream valued at $300,000 by Lyons and Garrison was moved from LPS to Garrison. And although Lyons was paid handsomely for facilitating this transfer, LPS got nothing for it.

The most important question to me when I rendered the initial decision in this case was not whether value was conveyed, because I thought it obvious that there was – or else why would Garrison pay anything – but, rather, whether that value belonged to LPS or Christopher Lyons individually. This is an inherently factual question, see Abbey v. Deyo, 44 N.Y. 343, 347 (1871), and I found it in favor of plaintiffs. I found that the interest being conveyed belonged to LPS because Mr. Lyons had chosen to do business as an employee of LPS and elected to take the advantages that derived from the corporate form, like limited liability and Subchapter S tax treatment. Having chosen to operate not as a sole proprietorship but as a corporation, and having developed and mined those contacts for the benefit of LPS, I do not believe that Mr. Lyons had the right to pull back that business opportunity like a yo-yo for his own benefit and the detriment of his creditors, including, at least, plaintiffs here.

Garrison argues that without Lyons, the customer list had no value, but that is contrary to my factual findings and, in any event, is beside the point. What matters is whether Lyons was acting on his own account or as an employee of LPS when he sent LPS' customers to Garrison.

The parties could characterize it any way they wanted to in the consulting agreement but, as set forth above, I think it is clear that he was acting in the latter capacity.[5] Here, I found that Garrison had no interest in Lyons' services; the "consulting agreement" was meant to transfer only what it did transfer: the business of LPS' customers and the opportunity that it presented.

Of course, in entering into the "consulting agreement," Garrison's lawyer was careful to try to portray Lyons rather than LPS as the owner of the contacts. But even there, where Garrison had the ability to characterize the value in any way it wanted, the reality is apparent. The agreement language strains to portray the interest as belonging to Mr. Lyons, even though it had to acknowledge that LPS had been the beneficiary of those contacts theretofore:

> WHEREAS, the Consultant was recently employed by LYONS PROFESSIONAL SERVICES, INC., and established a certain following of customers and accounts; and

> WHEREAS, Consultant, simultaneously upon execution of this Agreement, will terminate his employment with LYONS PROFESSIONAL SERVICES, INC., but shall continue to service these customers and accounts for the consulting fee set forth below . . . .[6]

As reflected in my initial decision, the recitation of an obligation to "continue to service these customers" was a fiction; it never happened in any significant way.

Moreover, in what appears to me to have been a clear recognition by Garrison of the vulnerability of this transaction, Garrison required a sign-off from LPS, that is, a disclaimer from LPS that it had no interest in the customer accounts being conveyed. At the very end of the agreement, on a separate page, the following endorsement appears:

---

[5] This case therefore stands in contrast to cases like <u>State Farm Ins. Co. v. Shanley & Schwartz</u>, 111 A.D.3d 918, 975 N.Y.S.2d 757 (2nd Dep't 2013), and <u>SMS Fin. XV, LLC v. Raquette Lake Camps, Inc.</u>, 90 A.D.3d 741, 935 N.Y.S.2d 36 (2nd Dep't 2011). In those cases, the courts found factually that what the creditors were trying to capture was the future income stream generated by the former owners of the judgment debtors through their own future labor.

[6] As noted in my initial decision, Mr. Lyons testified that even after he entered into the "consulting agreement," he remained employed by LPS, notwithstanding the terms of the agreement.

The undersigned hereby consents and agrees to the execution of this agreement by the above parties and acknowledges that the execution of same does not constitute a default by the Consultant with the undersigned or any agreement, whether verbal or in writing. This Agreement shall grant the undersigned no rights, claims, demands or causes of action against the above parties by reason of the actions contemplated therein. The undersigned acknowledges that it previously has entered into an agreement with the Consultant whereby it consented to allow the Consultant to compete with and solicit customers previously procured by the Consultant. The undersigned has reviewed the list of customers set forth in Schedule "A" hereto, and acknowledges that these customers had been procured by Consultant, that the information concerning them may be used by the Consultant herein, and that this information does not constitute confidential information and/or trade secrets subject to protection.

It comes as no surprise that "the undersigned," that is, the party that signed this endorsement, was LPS, even though it was ostensibly not a party to the Garrison-Lyons "consulting agreement." It is further no surprise that the individual signing this endorsement on behalf of LPS is the only individual who could – it is signed by "Christopher Lyons, President." Thus, what we have is Christopher Lyons causing his company to represent that it has no interest in the asset for which he is about to personally receive $300,000.

If there is one area of the law that has little regard for form over substance, it is fraudulent conveyance law, for parties and their lawyers frequently demonstrate ingenuity in attempting to camouflage the economic reality of transactions with distressed companies. "[F]raudulent conveyance law looks at substance, not form." In re Tronox, 503 B.R. 239, 276 (Bankr. S.D.N.Y. 2013), citing, Orr v. Kinderhill Corp., 991 F.2d 31, 35 (2d Cir. 1993) ("In equity, 'substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done'"), quoting, Pepper v. Litton, 308 U.S. 295, 305, 60 S. Ct. 2389 (1939); MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Services Co., 910 F. Supp. 913 (S.D.N.Y. 1995) (generally courts "look past the form of a transaction to its substance"). See also HBE Leasing Corp. v. Frank, 48 F.3d 623, 638 (2d Cir. 1995) ("the

District Court correctly disregarded the form of the transaction and looked instead to its substance"); In re Lyondell Chemical Co., 503 B.R. 348, 380-81 (Bankr. S.D.N.Y. 2014). As these cases illustrate, far more sophisticated transactions, as compared to the rather transparent effort here, have failed to contract around the fraudulent conveyance laws. I have little doubt that had there been an LPS bankruptcy trustee, no court would have upheld this transaction. And I see no difference in plaintiffs' rights in this regard as compared to a bankruptcy trustee.

Thus, when I found in my initial decision that Mr. Lyons had "made the introduction" of these clients to Garrison, my view was that he could only do so as an employee of LPS. He did not have the right to cheat his creditors by wearing his LPS hat when it suited him and taking it off when it did not. The midnight memorandum that Garrison circulated confirmed this. It did not talk about the clients no longer being serviced by Lyons, but, rather, it stated that "*The Lyons team* and GARRISON team have worked diligently to ensure a smooth transition and will place the utmost priority on not only continuing but also enhancing the services for our new clients" (emphasis added). The "Lyons team" is an obvious invention to avoid referring to LPS.

It would be facile to say that because there were no contracts of a defined term, nor "other proprietary information," Mitchell II, 579 F. App'x at 22, there was no value moved from LPS to Garrison, *i.e.*, no "conveyance" as that term is used in the DCL. The Garrison memorandum quoted above showed that at least on Day 2, the former LPS customers had little choice but to continue with Garrison, as their alternative was to go without security guards while they shopped around for a new service.

And why would they shop? There was no indication in the record of LPS customer disgruntlement, only that LPS apparently couldn't run its business well enough to make a profit from these relationships, whereas Garrison thought that it could. If the customers were happy

with the guards wearing an LPS patch, there is no reason to think they would suddenly become dissatisfied with those same guards wearing a Garrison patch. Although the trial record showed that, over time, there was some turnover in the accounts that had gone from LPS to Garrison, there was no indication that such turnover was in any way abnormal for this industry. The unavoidable conclusion is that while Lyons and Garrison both recognized the possibility or even likelihood of a degree of customer turnover, they still thought it was worth at least $300,000 to give Garrison the business opportunity.

Thus, when I said that the clients "agreed" to move to Garrison, I was not placing any particular importance for valuation purposes on the fact that they did not immediately terminate Garrison and look for another company. They could have done that, but the valuation placed on this business opportunity by Garrison and Mr. Lyons suggested that whatever happened, they still thought $300,000 was a fair price for the opportunity to maintain that business.

One way to ensure proper framing of the issue in this case is to consider what would have happened if LPS had not been 100% owned by Lyons, but instead, he had a controlling interest plus some number of equity investors. One can be sure that even if LPS was unprofitable (and it was), it would not sit well with equity investors for Lyons to shut down the business on Day 1, and receive $300,000 from Garrison to keep servicing the same clients through another company on Day 2. After all, this case is very different from those in which a broker – a mere employee – changes jobs, leaves the business otherwise intact, and then continues servicing the clients he cultivated at the his prior employer. See e.g. Morgan Stanley Smith Barney LLC v. O'Brien, No. 13-cv-01598, 2013 WL 5962103 (D. Conn. Nov. 6, 2013). Lyons owned LPS and because of that, he controlled all of its business opportunities.

As a majority holder and controlling person, Lyons would owe a fiduciary duty to any equity investors not to do what he did here. And Garrison, which would have to be willfully blind not to see what was happening here, would no doubt have exposure for aiding and abetting that breach of fiduciary duty. I do not see how actual judgment creditors can have less right to challenge this transaction than the hypothetical equity investors above. For one thing, although it was not material to my decision, I found that LPS was, in fact, insolvent. See Mitchell I, 2013 WL 4710431, at *4 n.2. The law is clear that when a corporation is insolvent, *i.e.*, without equity, its creditors step into the shoes of investors and are owed a fiduciary duty by the majority owners and directors of the corporation. In other words, "the moment a corporation becomes insolvent[,] the assets of the corporation must then be regarded as a trust fund for the payment of all its creditors and the directors occupy the position of trustees and fiduciaries." Technic Eng'g, Ltd. v. Basic Envirotech, Inc., 53 F. Supp. 2d 1007, 1011 (N.D. Ill. 1999) (quoting Coleman v. Howe, 154 Ill. 458, 467, 39 N.E. 725, 727 (1895)); see also Teras Intern. Corp. v. Gimbel, No. 13 Civ. 6788, 2014 WL 7177972 (S.D.N.Y. Dec. 17, 2014) ("once a corporation is insolvent, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of creditors.").

In sum, it is my view that New York's substantive fraudulent transfer laws give creditors a broader claim for relief than its special proceeding statute, not a lesser one. And although most states hold that the there is no claim for aiding and abetting a fraudulent transfer, see, e.g., In re Parmalat Sec. Litig., 377 F. Supp. 2d 390, 417 & n.177 (S.D.N.Y. 2005) (collecting cases and "declin[ing] to create such a claim" under Illinois law), transferee liability obviates the need for an aiding and abetting claim in cases like this one.

There were, indeed, other choices that might have been open to Garrison if it wanted this business opportunity without participating in a fraudulent transfer and becoming liable to LPS' creditors. Its deal with Mr. Lyons, instead of a bogus "consulting agreement" which was aimed to disguise the movement of value from LPS to Garrison, could have been structured through a Chapter 11 sale. The debt to plaintiffs could have been paid off at least in part under a plan of reorganization; Garrison would have achieved the business opportunity it desired; and even Mr. Lyons might have walked away with some stipend for his cooperation in the process, although undoubtedly not $300,000. I am not saying that such a scenario was necessarily feasible, but only suggesting that there may have been other ways for Garrison to get the business opportunity it desired without doing it wholly at the expense of LPS' creditors.

Instead, Garrison got the business opportunity, Lyons received 100% of the parties' valuation of that opportunity, and plaintiffs received nothing on their judgment. In my view, this is exactly the situation that the fraudulent conveyance laws were designed to prevent.

## CONCLUSION

On remand, plaintiffs' motion for judgment against Garrison is again granted. The Clerk is directed to enter judgment in favor of plaintiffs and against Christopher Lyons and Garrison Protective Services, Inc., jointly and severally, in the amount of $266,590.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
      June 8, 2015